UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ANTONIO JULIUS BRADLEY, SR.,

            Plaintiff,

   v.

BRANDON MIRES, ET AL.,

            Defendants.

Case No. C22-5806-JHC-SKV

REPORT AND RECOMMENDATION

Antonio Julius Bradley, Sr. ("Plaintiff") is a state prisoner who is proceeding pro se and *in forma pauperis* in this 42 U.S.C. § 1983 civil rights action. He brings a claim under § 1983 against Sergeant Brandon Mires, Officer Sylvester Weaver, and Officer Bret Terwilliger of the Tacoma Police Department (collectively "Defendants").[1] *See* Dkt. 4 at 3–4. He alleges Defendants used excessive deadly force against him in violation of his Fourth Amendment right to be free from excessive force when, on September 2, 2020, they collectively fired over thirty rounds of bullets at him.[2] *See* Dkt. 4 at 4–5. Plaintiff alleges he was struck by two bullets—one in his stomach and one in his back. *See id.* at 5. He seeks 3.5 million dollars in damages for

---

[1] The Court refers to Defendants by the rank they held at the time of the incident. *See* Dkt. 44 at 2 nn.1–2.

[2] As the Court previously explained, Plaintiff initially styled his claim as one brought under the Eighth Amendment, but it is properly construed under the Fourth Amendment. *See* Dkt. 16 at 4.

REPORT AND RECOMMENDATION - 1

alleged pain and suffering caused by Defendants in their individual and official capacities. *See id.* at 7.

On August 14, 2025, Defendants moved for summary judgment on Plaintiff's claim. *See* Dkt. 44. To date, Plaintiff has not filed an opposition. Having considered the parties' submissions, the balance of the record, and the governing law, the Court recommends that Defendants' Motion for Summary Judgment at Docket No. 44 be GRANTED and this case DISMISSED with prejudice.

## LEGAL STANDARD

Courts "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets its burden, the nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

In ruling on a motion for summary judgment, the Court limits its inquiry to whether a genuine issue for trial exists. *See id.* at 249. In conducting that inquiry, the Court views the

1  evidence and draws all reasonable inferences in favor of the nonmoving party. *See id.* at 225. It
2  does not "weigh the evidence and determine the truth of the matter." *Id.* at 249.
3        Courts may not grant a motion for summary judgment simply because it is unopposed.
4  *See Cristobal v. Siegel*, 26 F.3d 1488, 1494–95, 1495 n.4 (9th Cir. 1994). Courts may, however,
5  consider facts undisputed for purposes of the motion where a party fails to properly address
6  another party's assertion of fact and may grant summary judgment if the movant's evidence
7  sufficiently supports the motion and demonstrates the absence of a genuine issue of material fact.
8  *See* Fed. R. Civ. P. 56(e); *Williams v. Santa Cruz Cnty. Sheriff's Dep't*, 234 F. App'x 522, 523
9  (9th Cir. 2007).

## UNDISPUTED FACTS

11        Because Plaintiff has not addressed Defendants' assertions of fact, the Court considers
12  the following facts, which are supported by Defendants' evidence, undisputed. *See* Fed. R. Civ.
13  P. 56(e).
14        On September 2, 2020, dispatchers informed Defendants that multiple 911 callers had
15  reported shots fired at the 3800 block of South D Street in Tacoma around 7:00 a.m. *See* Dkt. 47
16  at 2; Dkt. 49 at 2; Dkt. 48 at 2. Callers also reported a woman screaming, a vehicle that left the
17  scene, later determined to have been driven by gunshot victim Kermit Gordon ("Gordon"), and a
18  Black male suspect wearing a Seahawks jersey who retreated into a house at the northwest
19  corner of the intersection at South D Street and 40th Street ("the residence"). *See* Dkt. 47 at 2;
20  Dkt. 49 at 2–3; Dkt. 48 at 2. Multiple police officers responded, including Defendants. Each
21  Defendant arrived separately in marked patrol cars and wearing police uniforms. *See* Dkt. 47 at
22  2; Dkt. 49 at 3; Dkt. 48 at 2.

Officer Weaver and Officer Hanna Bush arrived first. *See* Dkt. 47 at 2. As he approached, Officer Weaver saw a Black male wearing dark clothing exit the residence "yelling something about 'cops'" and appearing agitated before reentering the residence. *Id.* at 2–3. Officer Weaver parked at the southeast corner of the intersection of South D Street and 40th Street. *See id.* at 3. He saw Sergeant Mires arrive, circle the roundabout, and park his fully marked patrol car near the northeast corner of the intersection facing the residence. *See id.* Officer Terwilliger arrived close in time to Officer Weaver and Sergeant Mires. *See id.*; Dkt. 48 at 3. He parked his patrol car north of the residence, facing south towards the residence. *See* Dkt. 48 at 3.

Officer Weaver began walking to Sergeant Mires' vehicle. *See* Dkt. 47 at 3. As he neared the passenger side of Sergeant Mires' vehicle, Officer Weaver saw a black male, later identified as Plaintiff, exit the residence and walk towards them. He then saw Plaintiff raise his arm and start shooting a gun at him and Sergeant Mires multiple times. *See id.* Officer Weaver moved closer to the side of Sergeant Mires' car and returned fire. *See id.* Sergeant Mires remained in his patrol car. *See id.*; Dkt. 49 at 4.

After parking, Sergeant Mires got on his radio to tell Officer Terwilliger to hold his position and to instruct his team to move to a secured radio to discuss next steps. *See* Dkt. 49 at 4. While still seated in his vehicle and holding his radio microphone, Sergeant Mires saw a Black male wearing a Seahawks jersey, later identified as Plaintiff, "charging" towards him and firing a gun at him. *See id.* at 4. Sergeant Mires ducked down inside his patrol car, feeling "trapped in" his vehicle and returned fire, shooting multiple rounds through his windshield. *See id.* Sergeant Mires and Officer Weaver believed Plaintiff was trying to kill them. *See id.*; Dkt. 47 at 3.

REPORT AND RECOMMENDATION - 4

Meanwhile, Officer Terwilliger saw Plaintiff walking east towards the street from the residence with his arm extended, holding a gun. *See* Dkt. 48 at 3–4. He could see and hear Plaintiff shooting his weapon in Sergeant Mires' direction. *See id.* at 4. Officer Terwilliger exited his car and began firing his service weapon towards Plaintiff from behind his driver's side door. *See id.* Officer Terwilliger feared Plaintiff could kill his fellow officers. *See id.*

Plaintiff continued moving and shooting at the officers while trying to take cover behind a Ford Focus parked in front of the residence. *See* Dkt. 49 at 4; Dkt. 47 at 3–4; Dkt. 48 at 4. Sergeant Mires was able to exit his vehicle and sheltered behind the open driver's side door. *See* Dkt. 49 at 4. Sergeant Mires could see Plaintiff crouched behind the Focus through that car's windows. *See id.* at 4. Believing that Plaintiff remained armed and a threat, Sergeant Mires fired additional rounds in that direction, shattering the Focus's windows. *See id.* at 5. Officer Weaver, at some point, saw Plaintiff get into the driver's seat of the Focus. *See* Dkt. 47 at 4. Officer Terwilliger also continued firing in Plaintiff's direction until his magazine was empty. *See* Dkt. 48 at 4. Sergeant Mires continued firing until he saw Plaintiff fall down and make a noise that indicated he had been hit. *See* Dkt. 49 at 5. Sergeant Mires then called for medical aid and yelled for Plaintiff to "stay down." *Id.* Sergeant Mires and Officer Weaver saw Plaintiff crawl towards the planting strip without a gun in his hand. *Id.*; Dkt. 47 at 4. By the time Plaintiff fell down and stopped shooting, all three officers had ceased firing. *See* Dkt. 49 at 5; Dkt. 47 at 4; Dkt. 48 at 4–5.

SWAT and backup officers arrived on the scene to assist Defendants but did not fire any shots. *See* Dkt. 47 at 4; Dkt. 48 at 5. Plaintiff was detained and transported to the hospital for treatment. *See* Dkt. 49 at 5; Dkt. 47 at 4; Dkt. 48 at 5. Plaintiff suffered one or two bullet

wounds.[3]  After being stabilized, Defendant spoke with investigators and provided an audio-recorded interview.  *See* Dkt. 45 at 11.  He disclosed that he "smoked 'sherm' (PCP dipped cigarette) for the first time in 20 years[,]" "admitted to possessing the Glock handgun in the [residence]," stated that he did not remember shooting Gordon or at the police officers, and stated that he "must have had a bad trip." *Id.*

Plaintiff filed his Complaint while facing charges for assault in the first degree against Gordon, the individual allegedly shot by Plaintiff that triggered the police response, and Sergeant Mires.  *See* Dkt. 45 at 6–7 (Information).  Plaintiff also faced a charge for unlawful possession of a firearm in the second degree.  *Id.* at 7–8.  The Court stayed this case pending resolution of Plaintiff's criminal case.  *See* Dkt. 17.  Plaintiff ultimately pled guilty to one count of assault in the first degree with a deadly weapon against Sergeant Mires in violation of RCW 9A.36.011(1)(a).  *See* Dkt. 45 at 17, 19–30, 34.  The Court subsequently lifted the stay and Defendants moved for summary judgment.  *See* Dkt. 40; Dkt. 44.

## ANALYSIS

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show that (1) he suffered a violation of rights protected by the Constitution or created by federal statute, and (2) the violation was proximately caused by a person acting under color of state law.  *See Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).  The causation requirement of § 1983 is satisfied if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that

---

[3] Defendants filed documents indicating that Plaintiff suffered one through-and-through gunshot to the abdomen, *see* Dkt. 50 at 81, but medical records appended to Plaintiff's Complaint indicate he was hit by two bullets, *see* Dkt. 4-1 at 21–22.  To the extent this represents a dispute of fact, it is not material because, as discussed *infra*, Defendants' actions were reasonable under the circumstances regardless of whether Plaintiff was hit once or twice.  All three Defendants ceased firing once they observed indications that Plaintiff had been hit and the threat he posed neutralized.

REPORT AND RECOMMENDATION - 6

caused the deprivation complained of. *See Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978)). "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

Plaintiff brought this action alleging that, "[a]lthough the Tacoma Police Department was responding to shots fired[,] the amount of shots fired at the plaintiff by Tacoma police is considered 'excessive[]'" and that, due to multiple officers shooting at him, "it was hard to determine if the plaintiff even fired shots at the officers involved, as they claimed he did to justify their use of 'excessive deadly force' against the plaintiff." Dkt. 4 at 5. Plaintiff appears to allege a Fourth Amendment violation on three theories. First, Plaintiff challenges whether he fired any shots to provoke Defendants' return fire. Second, Plaintiff argues that Defendants acted unreasonably by responding to him with deadly force that resulted in him being shot. Third, Plaintiff contends that the number of bullets fired at him constituted excessive force *per se*.

Defendants bring three arguments in support of summary judgment. First, they argue Plaintiff's action is barred under *Heck v. Humphrey*. Second, they contend that the force applied was reasonable, and therefore no constitutional violation occurred. Third, they argue their actions are covered by qualified immunity. *See* Dkt. 44 at 6. Defendants' first two arguments resolve this matter, and the Court declines to reach the third.

A.   *Heck v. Humphrey*

"Under *Heck*, a § 1983 action cannot be maintained by a plaintiff who has been convicted of a crime if 'a judgment in favor of the plaintiff would necessarily imply the invalidity of his

conviction or sentence.'" *Martell v. Cole*, 115 F.4th 1233, 1234 (9th Cir. 2024) (quoting *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)). "To decide whether success on a [§] 1983 claim would *necessarily* imply the invalidity of a conviction, [the Court] must determine which acts formed the basis for the conviction." *Lemos v. Cnty. of Sonoma*, 40 F.4th 1002, 1006 (9th Cir. 2022) (en banc). "When the conviction is based on a guilty plea, [the Court] look[s] at the record to see which acts formed the basis for the plea." *Id.* (first citing *Smith v. City of Hemet*, 394 F.3d 689, 696–97 (9th Cir. 2005) (en banc); then citing *Sanford v. Motts*, 258 F.3d 1117, 1119–20 (9th Cir. 2001)).

Since filing this action, Plaintiff has been convicted of a crime. He pleaded guilty to one count of assault in the first degree with a deadly weapon against Defendant Mires in violation of RCW 9A.36.011(1)(a). *See* Dkt. 45 at 17, 19–30, 34. "A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm[] . . . [a]ssaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death." RCW 9A.36.011(1)(a). Assault in the first degree "is a specific intent crime requiring proof of 'intent to produce a specific result, as opposed to intent to do the physical act that produces the result.'" *Walters v. Glebe*, No. C14-903 RSL-BAT, 2015 WL 2383365, *5 (W.D. Wash. May 18, 2015) (quoting *State v. Elmi,* 166 Wash.2d 209, 215 (2009)). "Self-defense, where applicable, is a complete defense that negates the mental state of intent and shifts the burden to the State of disproving self-defense beyond a reasonable doubt." *Id.* (citing *State v. Walden,* 131 Wash.2d 469, 473 (1997)); RCW 9A.16.020(3). However, "[a] defendant who is the aggressor cannot invoke self-defense." *Matter of Rusev*, 12 Wash. App. 2d 1025, at *4 (2020) (citing *State v. George*, 161 Wash. App. 86, 96, *review denied*, 172 Wash.2d 1007 (2011)).

Plaintiff summarized the facts that formed the basis for his guilty plea and conviction as: "On 9/2/2020 in Pierce County[,] WA[,] I did unlawfully [and] with intent to inflict great bodily harm assault another (Sgt. Mires) with a deadly weapon [and] was armed w[ith] a deadly weapon." Dkt. 45 at 29. He therefore admitted to intending to harm Sergeant Mires—a mens rea he could not have had if acting in self-defense. That Plaintiff fired at Sergeant Mires before Defendants returned fire is not a fact in dispute.

Plaintiff's guilty plea is incompatible with his theory that he may not have shot at Defendants. Plaintiff's conviction has not been reversed, expunged, or otherwise invalidated. *See Heck*, 512 U.S. at 487. There was no break between Plaintiff's assault with a deadly weapon and Defendants' response. *See Beets v. Cnty. of Los Angeles*, 669 F.3d 1038, 1044–45 (9th Cir. 2012). Were Plaintiff to prevail in this action by proving that he did not shoot at Sergeant Mires first and that Defendants' fire constituted excessive force, that would necessarily imply the invalidity of his conviction. *See, e.g.*, *Cunningham v. Gates*, 312 F.3d 1148, 1154 (9th Cir. 2002), *as amended on denial of reh'g* (Jan. 14, 2003) ("Cunningham's claims are squarely barred to the extent they depend on the theory that he did not provoke the firestorm[]" because his conviction required a finding that "he intentionally provoked the deadly police response, and that he did not act in self-defense."). Accordingly, this action is barred under *Heck* to the extent Plaintiff seeks to prove that Defendants fired on him unprovoked by his own attack on Sergeant Mires.

B.    Excessive Force

To the extent that Plaintiff does *not* dispute that he fired on Sergeant Mires first and only challenges Defendants' response with deadly force as unreasonable, his claim may not be barred under *Heck* because it does not necessarily imply the invalidity of his conviction. *See* Dkt. 4 at

5. However, on these facts, Defendants' use of deadly force was reasonable and therefore no violation of Plaintiff's Fourth Amendment right to be free from unreasonable seizures occurred.

Plaintiff was seized within meaning of the Fourth Amendment when he was shot. *See Torres v. Madrid*, 592 U.S. 306, 318 (2021) (holding that a person is seized the moment they are struck by a police officer's bullet). The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. "'[R]easonableness is always the touchstone of Fourth Amendment analysis,' and reasonableness is generally assessed by carefully weighing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Cnty. of Los Angeles v. Mendez*, 581 U.S. 420, 427 (2017) (alteration in original) (first quoting *Birchfield v. North Dakota,* 579 U.S. 438, 477 (2016); then quoting *Tennessee v. Garner,* 471 U.S. 1, 8 (1985)).

In *Graham v. Connor*, the Supreme Court explained that "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." 490 U.S. 386, 397 (1989) (citing *Scott v. United States*, 436 U.S. 128, 137–39 (1978)). The Court cautioned that reasonableness must be assessed from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, and must allow for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396–97.

To determine whether the force allegedly used to effect a seizure was objectively reasonable, the Court must balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id*. at

REPORT AND RECOMMENDATION - 10

396 (quoting *Garner,* 471 U.S. at 8). In other words, the Court weighs the type and amount of force inflicted against the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, whether the suspect is actively resisting arrest or attempting to evade arrest by flight, and any other relevant factors. *See id.*; *Jackson v. City of Bremerton*, 268 F.3d 646, 652 (9th Cir. 2001); *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). "Where the officer has probable cause to believe that the suspect poses a[n immediate] threat of serious physical harm, either to the officer or to others," such as where the suspect threatens the officer with a weapon, use of deadly force is constitutionally permissible. *Garner*, 471 U.S. at 11–12.

The Court begins by considering the type and amount of force inflicted in the lead-up to Plaintiff's arrest. Defendants fired their weapons until Plaintiff fell down. They then ceased firing, determined that Plaintiff no longer had a gun in his hand, and called for medical aid. Plaintiff was hit by one or two bullets. There is no evidence indicting Defendants applied any deadly force after the threat Plaintiff posed was neutralized.

Next, the Court considers the government's interest in the use of force by evaluating the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officer or others, whether the suspect was actively resisting arrest or attempting to evade arrest, and any other relevant factors. Regarding the first factor—the severity of the crime at issue— Defendants' evidence shows that Plaintiff was suspected of being armed and having already shot Gordon. Plaintiff then fired a gun at Defendants, the responding police officers. This first factor favors Defendants.

The second factor requires the Court to consider whether Plaintiff posed an immediate threat to officer or public safety. This is the most important of the *Graham* factors. *See Bryan*,

630 F.3d at 826 (citing *Smith*, 394 F.3d at 702). The "threat analysis must be based on objective factors and not merely 'a simple statement by an officer that he fears for his safety or the safety of others.'" *Nelson v. City of Davis*, 685 F.3d 867, 880 (9th Cir. 2012) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001)). Plaintiff approached Sergeant Mires, who was in a marked police patrol car, and opened fire on him on a residential street. Officer Weaver was approaching Sergeant Mires' vehicle. This conduct posed an immediate, lethal threat to Sergeant Mires, Officer Weaver, and the public. The second factor also favors Defendants.

The third factor considers whether Plaintiff was actively resisting arrest or attempting to evade arrest. Defendants had not made contact with Plaintiff or initiated an arrest when this incident occurred. However, after police drove by and then parked near the residence, Plaintiff emerged with a gun and started firing at Sergeant Mires' vehicle. Plaintiff then moved behind a Ford Focus and eventually sat in the driver's seat. The Court finds Plaintiff was attempting to resist and evade arrest, and this factor favors Defendants.

One additional factor is relevant: the "availability of alternative methods of capturing or subduing a suspect." *Smith*, 394 F.3d at 701 (citing *Chew v. Gates,* 27 F.3d 1432, 1440 n. 5 (9th Cir. 1994)). Here, there were none. Because Plaintiff emerged from the residence and fired his weapon before Defendants could initiate contact and before Sergeant Mires could exit his vehicle, Defendants had no opportunity to employ de-escalation tactics or lesser force. This factor also favors Defendants.

The Court concludes, in light of the *Graham* factors, that the force applied by Defendants was objectively reasonable under the circumstances. All three Defendants saw Plaintiff firing a gun at Sergeant Mires after responding to 911 calls reporting that someone of Plaintiff's description had fired shots. There was no question that Plaintiff imposed a threat of serious

REPORT AND RECOMMENDATION - 12

physical harm to the responding officers and the public when he pointed his gun at Sergeant Mires' vehicle and began firing. *See Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614, 620 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 559 (2024) ("when a suspect points a gun in an officer's direction, 'the Constitution undoubtedly entitles the officer to respond with deadly force.'" (quoting *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)). Due to the suddenness of Plaintiff's attack, Defendants had no time to de-escalate the situation or attempt to resolve it using less force. Defendants ceased firing at Plaintiff as soon as they saw him fall down, and one or two bullets hit Plaintiff.

To the extent Plaintiff does not dispute that Defendants were entitled to respond to his conduct with some deadly force and merely challenges *how many times* they shot at him as excessive, such a claim is not clearly cognizable. "[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Est. of Hernandez by & through Hernandez v. City of Los Angeles*, 139 F.4th 790, 800 (9th Cir. 2025) (alteration in original) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014)). "[A]n officer cannot reasonably 'continue shooting' a criminal suspect who 'is on the ground,' 'appears wounded,' and 'shows no signs of getting up' unless the officer first 'reassess[es] the situation'[] . . . because the suspect 'may no longer pose a threat.'" *Id.* at 802–03 (second alteration in original) (quoting *Zion v. Cnty. of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017)). That reassessment was conducted here. By the time each Defendant observed indications that Plaintiff had been hit, they had already ceased firing. The Fourth Amendment does not impose an arbitrary shots quota which, once spent, either forces officers to succumb to a suspect's attack or exposes them to liability.

Because the force used by Defendants was objectively reasonable, no violation of Plaintiff's Fourth Amendment rights occurred. Accordingly, Defendants are entitled to summary judgment on Plaintiff's § 1983 claim. Because the Court finds no constitutional violation occurred, it need not reach Defendants' qualified immunity argument.

## CONCLUSION

For the foregoing reasons, the Court recommends that Defendants' Motion for Summary Judgment be GRANTED and that this case be DISMISSED with prejudice. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit not later than **fourteen (14) days** from the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar **fourteen (14) days** from the date they are filed. Responses to objections may be filed by **the day before the noting date**. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **October 31, 2025**.

Dated this 10th day of October, 2025.

S. KATE VAUGHAN
United States Magistrate Judge

REPORT AND RECOMMENDATION - 14